# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                              No. CR 20-0076 JB/LF

HUGO CESAR ESCATEL-PINTADO,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed November 2, 2020 (Doc. 38)("Objections").  The Court will sentence Defendant Hugo Cesar Escatel-Pintado on January 22, 2021. See Notice of Hearing as to Hugo Cesar Escatel-Pintado, filed December 18, 2020 (Doc. 41).  The primary issue is whether the Court should sustain Escatel-Pintado's Objection to the United States Probation Office's ("USPO") application of a 2-level enhancement under United States Sentencing Guideline ("U.S.S.G." or "Guidelines") § 2D1.1(b)(12), based on the USPO's determination that Escatel-Pintado was convicted of a drug trafficking crime, and, in the process, "'maintained a premises for the purposes of distributing a controlled substance.'"  Presentence Investigation Report as to Hugo Cesar Escatel-Pintado ¶ 19, at 5, filed October 6, 2020 (Doc. 33)("PSR")(quoting U.S.S.G. § 2D1.1(b)(12)).  The Court will overrule Escatel-Pintado's Objection to the USPO's application of a 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(12), because the Court determines that, in accordance with U.S.S.G. § 2D1.1's application note seventeen, Escatel-Pintado "maintained" the premises -- his apartment in Albuquerque, New Mexico -- for the "primary purpose" of distributing heroin, even if Escatel-Pintado also used his apartment for simultaneous living purposes.  U.S.S.G

§ 2D1.1. Application Note 17.  <u>See</u> U.S.S.G. § 2D1.1.  The Court concludes that Escatel-Pintado maintained his apartment for the primary purpose of distributing heroin, because (i) before Escatel-Pintado's arrest, law enforcement made controlled purchases of heroin from Escatel-Pintado at the apartment, <u>see</u> PSR ¶ 9, at 3-4; (ii) when law enforcement arrested Escatel-Pintado and searched the apartment, it found almost two kilograms of heroin and drug paraphernalia related to the sale of heroin, <u>see</u> PSR ¶ 10, at 4;  and (iii) Escatel-Pintado admitted to law enforcement that distributing drugs was the primary purpose of him coming to the United States, <u>see</u> PSR ¶ 12, at 4.  <u>See also</u> <u>United States v. Lozano</u>, 921 F.3d, 944, 946-47 (10th Cir. 2019); <u>United States v. Murphy</u>, 901 F.3d 1185, 1191-92 (10th Cir. 2018); <u>United States v. Cantrell</u>, 817 F. App'x 614, 619 (10th Cir. 2020)(unpublished); <u>United States v. Martinez</u>, 803 F. App'x 204, 207 (10th Cir. 2020)(unpublished).  The Court, therefore, concludes that the USPO's application of the 2-level enhancement, pursuant to U.S.S.G. § 2D1.1(b)(12), is not contrary to the U.S.S.G.  <u>See</u> U.S.S.G. § 2D1.1; U.S.S.G § 2D1.1. Application Note 17.  Accordingly, the Court overrules Escatel-Pintado's Objection.

## **FACTUAL BACKGROUND**

The Court takes its facts from the PSR.  <u>See</u> PSR ¶ 1-13, at 3-4.  The Court provides these facts for background.  It does not adopt them as the truth, and it recognizes that these facts are largely Plaintiff United States of America's version of events.

In July 2019, law enforcement received information from a confidential informant that Escatel-Pintado was looking for customers to purchase heroin from him.  <u>See</u> PSR ¶ 9, at 3.  After receiving the information, law enforcement conducted two controlled purchases of heroin from Escatel-Pintado's apartment, located in Albuquerque, New Mexico.  <u>See</u> PSR ¶ 9, at 3-4.  The drug amounts that law enforcement obtained at this time are unknown, because they are not in

discovery.  See PSR ¶ 9, at 4.  On December 13, 2019, a search warrant was authorized for Escatel-Pintado's apartment.  See PSR ¶ 10, at 4.  On December 20, 2019, law enforcement executed the search warrant on Escatel-Pintado's apartment.  See PSR ¶ 10, at 4.  At the apartment, law enforcement located "2046 grams of heroin," which was later confirmed by laboratory reports to total 1,802 net grams of heroin.  PSR ¶ 11, at 4.  The heroin was "located in the bottom of the kitchen oven in a single package."  PSR ¶ 11, at 4.  In addition, law enforcement located "a digital scale, three boxes of clear plastic baggies, balloons, a suspect cutting agent, and a suspected drug ledger."  PSR ¶ 11, at 4.  Law enforcement subsequently took Escatel-Pintado into custody, during which, Escatel-Pintado admitted to law enforcement that (i) he was "the sole occupant of the residence," PSR ¶ 12, at 4; (ii) he had "packed and sold the heroin that law enforcement located for profit," PSR ¶ 12, at 4, and (iii) an "unknown individual recruited him from Mexico," and he had "agreed to come to the United States under the direction of an unknown individual in order to deliver drugs," PSR ¶ 12, at 4.  On January 9, 2020, Escatel-Pintado was charged with a single count of "Possession with Intent to Distribute 1 Kilogram and More of Heroin."  PSR ¶ 1, at 3.  On July 27, 2020, Escatel-Pintado pleaded guilty to one count of "Possession with Intent to Distribute 1 Kilogram and More of Heroin," in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A).  PSR ¶ 2, at 3.

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  See United States v. Booker, 543 U.S. at 245.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth

numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they

have in the past, in determining whether a sentence is unreasonable."  United States v. Booker,

543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater

than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2)

enumerates:

> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)   to afford adequate deterrence to criminal conduct;
>
> (C)   to protect the public from further crimes of the defendant; and
>
> (D)   to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of § 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider:

(i) the Guidelines;  (ii) the offense nature and the defendant's character;  (iii) the available

sentences;  (iv) the policy favoring uniformity in sentences for defendants who commit similar

crimes;  (v) the need to provide restitution to victims;  and (vi) any pertinent United States

Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C.

§ 3553(a)(1), (3)-(7).

Although the Guidelines sentencing ranges are no longer mandatory, both the Supreme

Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors

which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007).  The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  See United States v. Booker, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  United States v. Terrell, 445 F.3d at 1264.  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption" (emphasis in original); United States v. Conlan, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes the district court erred in affording a presumption of reasonableness to the recommended advisory sentence," because "the guideless are presumptively reasonable only at the appellate level").

Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption

in favor of the advisory Guidelines sentence.[1] See Kimbrough v. United States, 552 U.S. at 90-91;

---

[1]Attorneys and courts often say that the "Guidelines" are advisory, Gall v. United States, 552 U.S. at 46 ("As a result of our decision [in United States v. Booker,], the Guidelines are now advisory . . . ."); United States v. Leroy, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); United States v. Sells, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it appears more appropriate to say that the resulting Guidelines ranges or sentences are advisory. The Court must consider the Guidelines, see Gall v. United States, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, see Gall v. United States, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."). The Court is not mandated, however, to apply a sentence within the calculated Guidelines range. See United States v. Sierra-Castillo, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-Booker have discretion to assign sentences outside of the Guidelines-authorized range . . . ."). Accord United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

    The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, departing from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently depart from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

    . . . .

    The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-

Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure factors in the Booker calculus, even if the court does not grant a downward departure.

United States v. Apodaca-Leyva, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." Kimbrough v. United States, 552 U.S. at 89 (quoting Gall v. United States, 552 U.S. at 51).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute." 530 U.S. at 481 (emphasis in original). The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction,

---

Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to depart from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.).

any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi v. New Jersey, 530 U.S. at 490. In Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in Apprendi v. New Jersey, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." Blakely v. Washington, 542 U.S. at 303 (emphasis in original)(citing Ring v. Arizona, 536 U.S. 584, 602 (2002); Harris v. United States, 536 U.S. 545, 563 (2002)(plurality opinion), overruled by Alleyne v. United States, 570 U.S. 99 (2013)). In United States v. Booker, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement." (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221)). More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute

methamphetamine.  See United States v. Magallanez, 408 F.3d at 676.  As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines.  See United States v. Magallanez, 408 F.3d at 682.  The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's fifty grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount.  See United States v. Magallanez, 408 F.3d at 682-83.  On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict."  United States v. Magallanez, 408 F.3d at 684.  Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).  The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance."  United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[2]  "[T]he application of an enhancement . . . does not implicate the Supreme

---

[2]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may

Court's holding in *Apprendi v. New Jersey*." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increases his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)[3](holding that, after Alleyne v. United States, "[i]t is well-established that

_____

require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level by 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (finding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

    [3]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an

sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence").  The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in <u>Alleyne v. United States</u> . . . expands the rule from <u>Apprendi v. New Jersey</u>, . . . (holding that facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence.  <u>See</u> [<u>United States v. Sangiovanni</u>, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

<u>United States v. Cervantes-Chavez</u>, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.).  The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' [] And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it[,]' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt."  <u>United States v. Haymond</u>, 139 S. Ct. 2369, 2378 (2019)(quoting <u>Alleyne v. United States</u>, 570 U.S. at 112-14).  Further, the Tenth Circuit has determined that a district court could use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with <u>Alleyne v. United States</u>, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range."  <u>United States v. Cassius</u>, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

---

unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> Tenth Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:  "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that <u>United States v. Cantrell</u>, 817 F. App'x 614, 619 (10th Cir. 2020)(unpublished); <u>United States v. Martinez</u>, 803 F. App'x 204, 207 (10th Cir. 2020)(unpublished); <u>United States v. Hendrickson</u>, 592 F. App'x 699 (10th Cir. 2014)(unpublished); and <u>United States v. Leroy</u>, 298 F. App'x 711 (10th Cir. 2008)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

## ANALYSIS

Escatel-Pintado argues that the USPO erred in applying a 2-level enhancement in the PSR ¶ 19, at 5, pursuant to USSG § 2D1.1(b)(12), based on the USPO's determination that Escatel-Pintado "'maintained a premise for the purpose of manufacturing or distributing a controlled substance.'"  Objections at 2 (quoting PSR ¶ 19, at 5 (quoting USSG § 2D1.1(b)(12)).  Escatel-Pintado contends that the 2-level enhancement should not apply, because, although law enforcement found drugs and drug paraphernalia in the Albuquerque apartment in which he lived, the distribution of heroin was not his primary or principle use of the apartment; rather, drug distribution was an "'incidental or collateral use.'"  Objections at 1-2 (quoting U.S.S.G § 2D1.1. Application Note 17).  The Court disagrees with Escatel-Pintado's argument, however, because the Court determines that, in accordance with U.S.S.G. § 2D1.1's application note seventeen, Escatel-Pintado "maintained" the "premise" -- his apartment in Albuquerque -- for the primary purpose of distributing heroin, even if, Escatel-Pintado also used his apartment for simultaneous living purposes.  USSG § 2D1.1(b)(12).  See U.S.S.G § 2D1.1. Application Note 17.  The Court reaches the conclusion that Escatel-Pintado maintained his apartment for the primary purpose of distributing heroin, because of the facts that (i) before Escatel-Pintado's arrest, law enforcement made controlled purchases of heroin from Escatel-Pintado at the apartment, see PSR ¶ 9, at 3-4; (ii) when law enforcement arrested Escatel-Pintado and searched the apartment, it found almost two kilograms of heroin and drug paraphernalia  related to the sale of heroin, see PSR ¶ 10, at 4; and (iii) Escatel-Pintado admitted to law enforcement that "an unknown individual recruited him from Mexico," and "he agreed to come to the United States under the direction of an unknown individual in order to deliver drugs," PSR ¶ 12, at 4.  See United States v. Murphy, 901 F.3d at 1191-92; United States v. Cantrell, 817 F. App'x at 619; United States v. Martinez, 803 F. App'x

at 207.  The Court, therefore, concludes that the USPO's application of the 2-level enhancement,

pursuant to U.S.S.G. § 2D1.1(b)(12), is not contrary to the U.S.S.G.

I.      **THE COURT OVERRULES ESCATEL-PINTADO'S OBJECTION TO THE USPO'S APPLICATION OF A 2-LEVEL ENHANCEMENT IN THE PSR'S ¶ 19, AT 5, PURSUANT TO U.S.S.G.  § 2D1.1(B)(12), BECAUSE (i) UNDER  U.S.S.G § 2D1.1. APPLICATION NOTE 17, ESCATEL-PINTADO ADMITS  HE HELD A POSSESSORY INTEREST IN HIS ALBUQUERQUE APARTMENT, GIVEN HE LIVED THERE; AND (ii) UNDER U.S.S.G § 2D1.1. APPLICATION NOTE 17, AND BASED ON TENTH CIRCUIT PRECEDEENT, THE PRIMARY PURPOSE OF ESCATEL-PINTADO'S APARTMENT WAS THE DISTRIBUTION OF HEROIN.**

The Court overrules Escatel-Pintado's Objection to the USPO's application of a 2 level-

enhancement, pursuant to U.S.S.G. § 2D1.1 (b)(12), because the Court determines that (i) under

U.S.S.G. § 2D1.1's application note seventeen, Escatel-Pintado held a "possessory interest" in his

Albuquerque apartment, given that Escatel-Pintado admits that he lived there, see Objections at 1;

PSR ¶¶ 9-11, at 3-4; and (ii) under U.S.S.G § 2D1.1. Application Note 17 and Tenth Circuit case

law,  the primary purpose of Escatel-Pintado's maintance of the apartment was the distribution of

heroin,  see U.S.S.G. § 2D1.1(b)(12); U.S.S.G § 2D1.1. Application Note 17.  See United States

v. Murphy, 901 F.3d at 1191-92; United States v. Cantrell, 817 F. App'x at 619; United States v.

Martinez, 803 F. App'x at 207.

When calculating Escatel-Pintado's guideline range, the USPO first determined that

U.S.S.G. § 2D1.1 is the relevant guideline governing a defendant's violation of 21 U.S.C. §

841(a)(1), and that, under U.S.S.G. § 2D1.1., the base offense level for Escatel-Pintado's offense

is 30.  See PSR's ¶ 18, at 5  See also U.S.S.G. § 2D1.1(a)(5).  The USPO then added a 2 level-

enhancement in the PSR's ¶ 19, at 5, based on "specific offense characteristics" related to Escatel-

Pintado's offense: "Possession with Intent to Distribute 1 Kilogram and More of a  Mixture and A

Substance Containing A Detectable Amount of Heroin."  PSR ¶ 19, at 5.  As the USPO explained,

the 2 level-enhancement, pursuant to § 2D1.1(B)(12), is justified, because, in relation to his

offense, Escatel-Pintado "'maintained a premise'" -- his Albuquerque apartment -- "'for the purpose of manufacturing or distributing a controlled substance'" -- heroin. PSR ¶ 19, at 5 (quoting U.S.S.G. § 2D1.1(b)(12)). Escatel-Pintado argues that the UPSO's 2-level enhancement, pursuant to § 2D1.1 (b)(12), is not applicable in the case. See Objections at 1-2. Escatel-Pintado concedes that: (i) he lived at the Albuquerque apartment; (ii) he pleaded guilty to a violation of 21 U.S.C. § 841(a)(1), "Possession with Intent to Distribute 1 Kilogram and More of a Mixture and A Substance Containing a Detectable Amount of Heroin," and (iii) "some drugs were found in his home" by law enforcement. Objection at 1. Nonetheless, Escatel-Pintado contends that the apartment's primary use was not "manufacturing or distributing a controlled substance," PSR ¶ 19, at 5; rather, the "primary use of his home was living," given that "he lived, slept, ate and had all of his belongings" at the Albuquerque apartment. Objections at 1.

U.S.S.G. § 2D1.1 is the relevant guideline that courts reference when evaluating offenses related to "unlawful manufacturing, importing, exporting, or trafficking (including possession with intent to commit these offenses); attempt or conspiracy." U.S.S.G. § 2D1.1. U.S.S.G. § 2D1.1(b)(12), in turn, directs courts to apply a 2-level upward enhancement to a defendant's base offense level "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. 2D1.1(b)(12). U.S.S.G. 2D1.1(b)(12)'s application seventeen explains:

> Section (b)(12) applies to a defendant who knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution.

> Among the factors the court should consider in determining whether the defendant "maintained" the premises are (A) whether the defendant held a possessory interest in (e.g., owned or rented) the premises and (B) the extent to which the defendant controlled access to, or activities at, the premises.

Manufacturing or distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises. In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes.

U.S.S.G. 2D1.1(b)(12) Application Note 17.

Under U.S.S.G. § 2D1.1(b)(12) Application Note 17, the Court, therefore, must make two determinations to assess the appropriateness of the USPO's application of U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement to Escatel-Pintado's base level offense score.  See U.S.S.G. § 2D1.1(b)(12) Application Note 17.  First, the Court must determine whether Escatel-Pintado had a "possessory interest" in the Albuquerque apartment.  U.S.S.G. § 2D1.1(b)(12) Application Note 17.  Second, if the Court determines that Escatel-Pintado had a "possessory interest" in the apartment, it must determine "the extent to which" Escatel-Pintado "controlled access to, or activities at, the premises."  U.S.S.G. § 2D1.1(b)(12) Application Note 17.  Because Escatel-Pintado concedes that he had a "possessory interest" in the Albuquerque apartment, U.S.S.G. § 2D1.1(b)(12) Application Note 17, given that he admits he lived at the apartment,  and, given that he "slept, ate and had all of his belongings" there, Objections at 1, the Court need  evaluate only the second question related to the extent to which Escatel-Pintado used the apartment for his heroin distribution activities, see U.S.S.G. § 2D1.1(b)(12) Application Note 17.  See also U.S.S.G. § 2D1.1(b)(12).

As U.S.S.G. § 2D1.1(b)(12) Application Note 17 outlines above, U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement is applicable even if drug distribution is "not . . . the sole purpose for which the premises was maintained."  U.S.S.G. § 2D1.1(b)(12) Application Note 17.  Instead, the Guideline requires that drug distribution be only "one of the defendant's primary or

principal uses for the premises, rather than one of the defendant's 'incidental or collateral' uses for

the premises." U.S.S.G. § 2D1.1(b)(12) Application Note 17 (no citation for quotation).  Here, in

assessing whether drug distribution is "one of the defendant's primary or principal uses for the

premises," the Court, in accordance with U.S.S.G. § 2D1.1(b)(12) Application Note 17, must

balance "how frequently" Escatel-Pintado used the Albuquerque apartment "for manufacturing or

distributing" heroin, and "how frequently" Escatel-Pintado used the premises "for lawful

purposes," such as sleeping, eating, living, and storing his belongings.  U.S.S.G. § 2D1.1(b)(12)

Application Note 17.

To assist the Court's evaluation of "the extent to which" Escatel-Pintado used his apartment

for the distribution of drugs, the Court references holdings from the United States Court of Appeals

for the Tenth Circuit, which have offered two caveats to its application of U.S.S.G. § 2D1.1(b)(12)

to defendants' sentences.  U.S.S.G. § 2D1.1(b)(12) Application Note 17.  See United States v.

Lozano, 921 F.3d at 946-47; United States v. Murphy, 901 F.3d at 1191-92; United States v.

Cantrell, 817 F. App'x at 619; United States v. Martinez, 803 F. App'x at 207.  First, in United

States v. Murphy, 901 F.3d at 1191-2, the Honorable Terrence L. O'Brien, United States Circuit

Judge for the Tenth Circuit, clarified that district courts should evaluate the frequency with which

a defendant uses his or her premise for lawful versus unlawful purposes with a consideration that

> [t]he frequent/substantial metric is a reciprocal sliding scale. A substantial
> drug distribution that regularly and quickly passes through the home (two or three
> days) on a bi-monthly or tri-monthly basis may qualify as a primary use of the
> premises for drug-related purposes much the same as an exquisitely frequent, but
> relatively paltry, operation.

901 F.3d at 1191.  Judge O'Brien subsequently explained that U.S.S.G. § 2D1.1(b)(12)

Application Note 17's primary or principal purpose test in assessing a defendant's use of his or

her premises should be conducted by courts with some recognition of a totality of the circumstances related to the defendant's crime:

> A totality of the circumstances assessment includes: (1) the frequency and number of drugs sales occurring at the home; (2) the quantities of drugs bought, sold, manufactured, or stored in the home; (3) whether drug proceeds, employees, customers, and tools of the drug trade (firearms, digital scales, laboratory equipment, and packaging materials) are present in the home, and (4) the significance of the premises to the drug venture.

United States v. Murphy, 901 F.3d at 1191-92 (citing United States v. Henderson, 604 F. App'x 655, 658 (10th Cir. 2015)(unpublished)("[A]lthough the premises was used as a residence, the drug trafficking activities were frequent and substantial enough to warrant the enhancement."); United States v. Verners, 53 F.3d 291, 296-97 (10th Cir. 1995); United States v. Contreras, 874 F.3d 280, 284-85 (7th Cir. 2017)("Instead of merely weighing the amount of legal activity against the illegal activity, the sentencing court should focus on both the frequency and significance of the illicit activities . . . ."); United States v. George, 872 F.3d 1197, 1206 (11th Cir. 2017); United States v. Bell, 766 F.3d at 634, 637 (6th Cir. 2014)("We assess the primary or principal use of the home . . . by comparing the frequency of lawful to unlawful use.  At bottom, the question is whether Bell's home played a significant part in distributing drugs."); United States v. Johnson, 737 F.3d 444, 447-48 (6th Cir. 2013).

Furthermore, when outlining the factors it considers to evaluate the totality of the circumstances related to a defendant's use of his or her premises, Judge O'Brien explained that "frequency calculations" related to the defendant's use of the apartment for drug distribution should be a mere consideration, as opposed to being a necessary mathematical calculation where the court must show its work.  United States v. Murphy, 901 F.3d at 1191.  For example, in United States v. Cantrell, 817 F. App'x 614, 619 (10th Cir. 2020), the Honorable Jerome A. Holmes, United States Circuit Judge for the United States Court of Appeals for the Tenth Circuit, explained

that, because the presence of "tools of the trade in a residence provides significant support for the application of § 2D1.1(b)(12) 2-level enhancement," the Tenth Circuit places great emphasis on the third factor being present when considering applying the 2-level enhancement.  United States v. Cantrell, 817 F. App'x at 619.

In addition, when evaluating the applicability of § 2D1.1(b)(12)'s 2-level enhancement, the Tenth Circuit has explained that "[t]he enhancement clearly contemplates a premises with more than one primary use," which is particularly relevant when the premises is used as the defendant's home.  United States v. Murphy, 901 F.3d at 1190.  Accordingly, as the Tenth Circuit explained, a premises can serve dual, simultaneous "lawful" and "unlawful" purposes, in that a premises can be used for lawful activity one-hundred percent of the time by a defendant, while it can simultaneously be used for a defendant's unlawful drug activity one-hundred percent of the time. United States v. Murphy, 901 F.3d at 1191 ("In other words, both simultaneous uses may well be primary.")

> Most people do not occupy their home 100% of the time; they spend much time at work, on vacation, running errands, pursuing social activities, etc.  While a home may not be occupied 100% of the time, it is considered to be a home 100% of the time in that it is always available to the owner (or renter), it contains most of the owner's possessions, and it is a safe haven.  That same reasoning is apt in multiple use situations.  Actual drug dealing may not be a constant in a home, but the home may well serve as a safe place to store drugs, cash derived from drug sales (thereby shielding it from official notice), and tools of the trade (such as equipment related to selling drugs and firearms), as well as serve as a headquarters for drug-related operations.  With that in mind, one may use his home (in the broad sense of the word) for lawful purposes 100% of the time and also use it (in the same broad sense of the word) for unlawful drug activity 100% of the time.  In other words, both       simultaneous       uses       may       well       be       primary.

United States v. Murphy, 901 F.3d at 1191 (emphasis in original).

The Tenth Circuit has consistently cited this principle when evaluating whether district courts have applied appropriately § 2D1.1(b)(12) 2-level enhancements to defendants' base

offense levels.  See United States v. Lozano, 921 F.3d at 946-47; United States v. Murphy, 901 F.3d at 1191-92; United States v. Cantrell, 817 F. App'x at 619; United States v. Martinez, 803 F. App'x at 207.  For example, United States v. Martinez, 803 F. App'x at 207, features a defendant's ineffective assistance of counsel claim based on the defendant's argument that his counsel offered ineffective assistance when failing to object to the district court's application of the § 2D1.1(b)(12) 2-level enhancements to the defendant's sentence, because the defendant's recreational vehicle ("RV") -- the premise where law enforcement found drugs and from where it was determined that the defendant had distributed the drugs from -- served as the defendant's home.  See United States v. Martinez 803 F. App'x at 207.  The fact that the defendant used the RV as his home, meant, according to the defendant, that the RV's primary purpose was not drug-related.  See United States v. Martinez 803 F. App'x at 207.  The Tenth Circuit, however, disagreed with the defendant's argument, reasoning instead that the RV had a primary use of facilitating the defendant's drug distribution, because, even though the defendant used the RV as his home, evidence showed that the defendant stored a significant quantity of methamphetamine, digital scales, and firearms in the RV -- all of which are paraphernalia of the methamphetamine drug trade.  See 803 F. App'x at 207.  The Tenth Circuit, therefore, dismissed the defendant's ineffective assistance of counsel claim, noting that any potential objection his counsel could have made to the district court's application of the § 2D1.1(b)(12) 2-level enhancement "would have failed for a lack of merit" based on the particular facts of the defendant's case.  United States v. Martinez, 803 F. App'x at 207

Comparably United States v. Cantrell, 817 F. App'x at 619, features a defendant disputing the district court's application of U.S.S.G. § 2D1.1(b)(12)'s 2-level enhancement, because, as the defendant argued, there was "nothing in discovery that points to the frequency of licit or illicit uses

of the residence." United States v. Cantrell, 817 F. App'x at 619.  In dismissing the defendant's

arguments, the Tenth Circuit concluded that there was "no non-frivolous basis for challenging the

district court's application of § 2D1.1(b)(12)." United States v. Cantrell, 817 F. App'x at 619.

Specifically, the Tenth Circuit concluded that it was clear that the primary purpose of the

defendant's maintenance of his residence was drug-related, given that law enforcement seized

from within the residence drug paraphernalia, including "methamphetamine, hydrocodone,

marijuana, two digital scales, and "used and unused packaging baggies." United States v. Cantrell,

817 F. App'x at 619.  The Tenth Circuit further justified its ruling by explaining that, in instances

where a defendant stores a large quantity of drugs and drug paraphernalia in his premises, the

distribution of drugs is most likely a primary purpose of the premise. See United States v. Cantrell,

817 F. App'x at 619.

> The cases are legion in our circuit (as well as others) that have deemed such
> items as law enforcement found in the search to be  'tools of the trade' that is, means
> for the distribution of illegal drugs." United States v. Martinez, 938 F.2d 1078,
> 1083 (10th Cir. 1991); accord United States v. Hall, 473 F.3d 1295, 1304 (10th Cir.
> 2007); United States v. Mendoza-Salgado, 964 F.2d 993, 1008 (10th Cir. 1992).
> And we have concluded that the presence of such tools of the trade in a residence
> provides significant support for the application of the § 2D1.1(b)(12) enhancement.
> See United States v. Murphy, 901 F.3d 1185, 1191-92 (10th Cir. 2018)(noting that,
> in the "totality of the circumstances assessment" appropriate for determining
> whether to apply the § 2D1.1(b)(12) enhancement, courts should consider, inter
> alia, whether "tools of the drug trade (firearms, digital scales, laboratory equipment,
> and packaging materials) are present in the home"); United States v. Martinez, 803
> F. App'x at 207 (holding that "any objection" to application of the § 2D1.1(b)(12)
> enhancement "would have failed for a lack of merit" because the defendant "used
> his RV to store a significant quantity of methamphetamine, digital scales, and
> firearms").

United States v. Cantrell, 817 F. App'x at 619-20.

Based on the text of U.S.S.G. § 2D1.1(b)(12) Application Note 17, and the guidance of

Tenth Circuit precedent, the Court concludes that Escatel-Pintado's primary purpose in

maintaining the Albuquerque apartment was to distribute heroin. See U.S.S.G. § 2D1.1(b)(12);

U.S.S.G. § 2D1.1(b)(12) Application Note 17.  See also United States v. Lozano, 921 F.3d at 946-47; United States v. Murphy, 901 F.3d at 1191-92; United States v. Cantrell, 817 F. App'x at 619; United States v. Martinez, 803 F. App'x at 207.  Three findings buttress the Court's conclusion that Escatel-Pintado's primary purpose in maintaining the apartment was to distribute heroin.  See PSR ¶¶ 9-13, at 3-4.  First, before Escatel-Pintado's arrest, law enforcement, using a confidential informant, made two controlled heroin purchases from Escatel-Pintado at Escatel-Pintado's Albuquerque, apartment.[4]  See PSR ¶ 9, at 3.  Second, similar to the defendant's premises in United States v. Cantrell, 817 F. App'x at 619, and the defendant's premises in United States v. Martinez, 803 F. App'x at 207, where law enforcement located a significant quantity of drugs and drug paraphernalia necessary for the distribution of drugs, Escatel-Pintado's apartment was found to contain a large quantity of a controlled substance -- 1,802 grams of heroin -- along with significant drug paraphernalia necessary for the distribution of heroin, which included "a digital scale, three boxes of clear plastic baggies, a bag containing balloons, a suspected cutting agent, and a ledger." PSR ¶ 11, at 4.  As the Tenth Circuit noted in United States v. Cantrell, 817 F. App'x at 619, the presence of this quantity of a controlled substance within a premises, in addition to the drug paraphernalia associated with the distribution of heroin, "provides significant support for the application of the § 2D1.1(B)(12) enhancement."  817 F. App'x at 619.  Third, the Court finds determinative the fact that Escatel-Pintado admitted to law enforcement that an "unknown individual recruited him from Mexico," and "he agreed to come to the United States under the direction of an unknown individual in order to deliver drugs."  PSR ¶ 12, at 4.  The Court reasonably determines, therefore, that, because Escatel-Pintado's primary purpose in coming to

---

[4]The drug amounts of the heroin are unknown, because they are not in discovery.  See PSR ¶ 9, at 3.

the United States was distributing drugs, Escatel-Pintado used his apartment, as evidenced by the quantity of heroin and drug paraphernalia in his apartment, to further his primary purpose of distributing drugs.  See PSR ¶ 12, at 4.

Based on the Court's determinations above, the Court concludes that Escatel-Pintado's argument that, because he "lived" in the apartment, and "slept, ate and had all of his belongs" there, these circumstances mean that drug distribution was not the apartment's primary purpose unconvincing.  Objections at 1.  Specifically, as the Court discussed above, the Tenth Circuit has held that a defendant can use a premise for the simultaneous primary purposes of living and distributing drugs, particularly when the premises is the defendant's home.  See United States v. Murphy, 901 F.3d at 1191 ("[O]ne may use his home (in the broad sense of the word) for lawful purposes 100% of the time and also use it (in the same broad sense of the word) for unlawful drug activity 100% of the time.  In other words, both simultaneous uses may well be primary.")(emphasis in original).  Accordingly, the Court concludes that, even if Escatel-Pintado lived and conducted lawful living activities within the apartment, the level of drug distribution activities that Escatel-Pintado performed in his apartment demonstrates that he used the apartment for more than one "primary purpose."  U.S.S.G. § 2D1.1(b)(12) Application Note 17.  See United States v. Murphy, 901 F.3d at 1191.  For similar reasons, the Court finds unconvincing Escatel-Pintado's related contention that the Court should view his drug dealing as "'incidental' or 'collateral'" activities to his living activities within his apartment.  Objections at 1 (quoting U.S.S.G. § 2D1.1(b)(12) Application Note 17.)  Namely, as the Court emphasizes above, Escatel-Pintado indicated explicitly to law enforcement that his primary purpose in entering the United States from Mexico was to distribute drugs.  See PSR ¶ 12, at 4.  Because there is no indication that Escatel-Pintado engaged in his money-making drug distribution enterprise elsewhere, but

rather, there is every indication that Escatel-Pintado engaged in all of the steps of his distribution activities from his Albuquerque apartment, see PSR ¶¶ 9-12, at 3-4, the Court reaffirms its conclusion that Escatel-Pintado's intended "primary purpose" in renting the apartment was to distribute drugs in furtherance of his "primary purpose" of entering the United States, U.S.S.G. § 2D1.1(b)(12).  Ultimately, then, the Court overrules Escatel-Pintado's Objection to the USPO's 2-level enhancement under U.S.S.G. § 2D1.1(b)(12).

**IT IS ORDERED** that the Defendant's Objections to the Presentence Report and Sentencing Memorandum, filed November 2, 2020 (Doc. 38), are overruled.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
  United States Attorney
Mark C. Pfizenmayer
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Margaret A. Katze
  Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

    *Attorney for the Defendant*